IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Michelle Vandine,** | |
| **Plaintiff,** | Case No. 2:14-cv-1242 |
| v. | Judge Graham |
| **Trinity Health System,** | Magistrate Judge Jolson |
| **Defendant.** | |

**OPINION & ORDER**

    Michelle Vandine argues that Trinity Health System ("Trinity") fired her for a reason that was mere pretext for its real reason: her age. But Trinity has shown that it had a good-faith basis to fire Vandine; she had several serious errors at work in the months leading up to her firing. Because Vandine does not show a genuine issue of material fact that Trinity's reason was mere pretext, Trinity's motion for summary judgment is granted.

**I)  Background**

    Vandine was a radiologic technologist (a "rad tech" in the parties' parlance) at Trinity for about 20 years. Trinity employed Vandine at a facility called "Health Center West." After being fired, Vandine filed a charge with the Equal Employment Opportunity Commission (the "EEOC"), and she received from the EEOC a right-to-sue letter. Vandine did sue, and in her amended complaint brings one claim of age discrimination under the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. 621–34, and its corollary Ohio statute. *See* Ohio Rev. Code § 4112.14(B).

    The necessary background for this summary-judgment analysis requires an understanding of Trinity's internal policies, the facts of Vandine's last error at work, and Trinity's application of its own policies in firing Vandine.

    Trinity had two policies that are important to this case. First, the Patient Identification Policy (the "Patient ID Policy"), the purpose of which is "to ensure all patients are accurately identified prior to any care, treatment, or services provided." (Def.'s Ex. A at PageID 410, Doc.

1

35-1). Relevant to this case, the Patient ID Policy says that, for "Point of Service Identification . . . . [a]ll inpatients/outpatients who present for treatment or service will be identified by name and date of birth provided on armband." (*Id.*).

Second, the Radiology Department at Trinity has a "Disciplinary Policy for Serious Radiology Errors." (Def.'s Ex. B, Doc. 35-1). Vandine was aware of the policy and understood its details. That policy describes two broad categories of errors: procedural infractions and serious infractions. A procedural infraction is "any error caused by employee failure to follow policy, procedure, or common radiology practices, negligence, or inattention to detail and/or duty." (*Id.* at PageID 412). Serious infractions are errors "that may have (or could have if not caught) caused inappropriate care, treatment, or harm of a patient." (*Id.* at PageID 414). "One serious infraction equals one occurrence." (*Id.*). But, "[p]otential serious errors that are promptly caught, corrected, documented, and clinicians notified before results have been called or typed and patient care affected, will be considered serious near misses and 3 near misses will equal 1 occurrence." (*Id.*). There is a non-exhaustive list of examples of serious errors, including "[i]ncorrect patient identification leading to performing wrong exam on wrong patient without proper documentation of correction or notification of incident." (*Id.*).

Trinity's policy lays out disciplinary actions too: "in the event of a violation of a rule, consideration will be given to all circumstances. Committing . . . . violations may be grounds for disciplinary action, ranging from counseling to discharge depending upon the seriousness of the infraction." (*Id.*) (quoting from Trinity Health System policy [HR.GEN-37 (East) / HR.GEN-55 (West)). The policy contemplates only three "occurrences." On the first occurrence, the "employee involved will be given formal written warning with counseling to include employee involvement in the cause and prevention of recurrence." (*Id.*). On the second occurrence, the "[e]mployee involved will be given a Five-day suspension with additional counseling to include employee involvement in the case and prevention of recurrences." (*Id.*). On the third occurrence, the "employee involved will be discharged." (*Id.*).

Finally, the policy lays out a perplexing description of how the disciplinary process increases in severity:

> With each occurrence the employees' previous six months history will be considered. After six months without an occurrence the employee will be out of steps for this disciplinary policy. The six month period will start with the first infraction. Violations of this policy can be combined with any other Medical Center viola-

>tions for disciplinary action when it is deemed necessary to do so for the welfare of the patient and/or the institution.

(*Id.* at PageID 415).

Vandine worked at Trinity for more than 22 years. She was 50 years old when she was fired. The incident that led to her firing was her fourth infraction in the previous three years. For her first infraction, in October 2010, Vandine misidentified a patient; the error caused x-rays to be assigned to the wrong patient. (Def.'s Ex. E, Doc. 35-1). This infraction was a serious infraction that resulted in an occurrence, and at step one, Vandine received a formal written warning with counseling. (*Id.*). Second, on May 9, 2012, Vandine failed to prioritize a STAT exam—a high priority x-ray examination. (Def.'s Ex. F, Doc. 35-1). This infraction was a serious infraction that resulted in an occurrence, and since it occurred more than sixth months after her last serious infraction, Vandine had "cycled-off" Trinity's probationary period, and it was counted as her first occurrence. Vandine was given a formal written warning with counseling. Third, on July 20, 2012, Vandine failed check a patient's identification bracelet, and she took an x-ray of the wrong patient. (Def.'s Ex. G, Doc. 35-1). This infraction was a serious infraction that resulted in an occurrence, and since it occurred within six months of her previous occurrence, Trinity gave her a five day suspension without pay. (*Id.*). Fourth, on December 6, 2012, Vandine helped perform an x-ray on a patient without verifying the patient's identification and comparing it to the information on the x-ray request form. (Def.'s Ex. D, Doc. 35-1). Trinity considered this infraction a serious infraction, and in a letter dated December 7, 2012 informed Vandine that it was terminating her employment. Trinity informed Vandine that "[t]his is your third occurrance (sic) of a serious error since 5/9/2012 and this error has occured (sic) within 6 months since your previous error on 7/20/12. Therefore, as per the Radiology Discipline Policy, I am discharging you from your position of Radiologic Technologist and terminating your employment with Trinity Medical Center West effective immediately." (Def.'s Ex. H, Doc. 35-1).

The factual predicate for this fourth and final infraction is the subject of the parties' intense interest. They agree about what happened; they disagree that what Vandine did was a violation of policy, specifically, the Patient ID Policy. According to Vandine, here's what happened:

Davenport asked Vandine to assist her in performing an x-ray on a pregnant patient, specifically, she needed help lifting the patient to get her in proper position for the x-ray. (Vandine Dep. 52:11–12). Davenport and Vandine went to the patient's room with the mobile x-ray machine. (*Id.* at 54:5–7). While in the room, Davenport went to the patient's bed where two indi-

3

viduals, likely nurses, were attending to the patient. (*Id.* at 54:11–55:11). Davenport then pulled a privacy curtain around the bed so that Vandine could not see the patient, Davenport, or the nurses. (*Id.*). Vandine stayed with the mobile x-ray machine while Davenport was behind the curtain. (*Id.* at 55:15–16). The curtain was pulled aside, Davenport had rolled the patient on her side, Vandine approached and put the x-ray film underneath the patient, and Davenport helped the patient roll back on the film. (*Id.* at 58:10–13). Vandine checked to make sure that the film was positioned properly under the patient. (*Id.* at 56:17–18). Vandine swung the arm of the mobile x-ray machine over the patient so that Davenport could use the lights to aim the x-ray. (*Id.* at 58:18–19). Vandine then assisted in retrieving the film, moving the machine out of the room, and she initialed the x-ray film. (*Id.* at 59:4–7). Vandine never heard or observed anyone check the patient's identity; she says she wasn't paying attention. (*Id.* at 56–59).

Davenport entered the x-ray results into Trinity's electronic medical records and sent those records to a radiologist for a report. Only when Davenport received the radiologist's report and forwarded it to the "unit clerk"—the title of the clerk in charge of composing the x-ray request form—did that clerk realize that she or another "unit clerk" had entered the wrong patient's name on the original order.

The attentive reader may be asking themselves: how could the two rad techs have x-rayed the "correct patient" if the x-ray request form listed a different patient? The Court sought high and low for the answer to this question, and it is buried, deep in a confusing interchange between Trinity's counsel and Vandine in her deposition. Here's what happened: Rather than going by the information on the x-ray request sheet, Davenport went to the floor listed on the x-ray request form and the nurses on that floor directed the rad techs—conspicuous as they were with their mobile x-ray machine—to the correct patient. Neither Davenport nor Vandine verified that the patient they x-rayed was the patient listed on the x-ray request form. If they had, they would have seen that either the nurses or the x-ray request form was wrong.

**II) Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the ab-

4

sence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

**III) Discussion**

Trinity argues that it had a legitimate, nondiscriminatory reason for terminating Vandine. Vandine violated one of Trinity's important policies: that all patients have their identities

checked before any care is administered. Not only this, but Vandine had another serious error within the previous six months and another serious error just two months before that.

The ADEA makes it illegal for an employer to fire an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). Age discrimination claims are analyzed under the same framework as Title VII claims. *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002). So too with related state-law claims of age discrimination. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Without direct evidence of discrimination, courts use the *McDonnel Douglas* "burden-shifting analysis, which requires a plaintiff first to establish a prima facie case of discrimination." *Policastro*, 297 F.3d at 538; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If an employee establishes this prima facie case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the employer articulates such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's justification is merely pretext. *Id.* at 804.

The parties agree that the analysis rests on the final step of the burden-shifting framework. Trinity concedes, for purposes of this motion, that Vandine can show a prima facie case of age discrimination. (Trinity's Mot. Summ J. at 13, Doc. 35). Next, Trinity offers a legitimate, nondiscriminatory reason for firing Vandine: she had a pattern of serious errors as defined by company policy that, per company policy, required her to be fired. Finally, Vandine argues that Trinity's reason is mere pretext for age discrimination.

"A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008); *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

Vandine offers the following arguments to show that Trinity's proffered reason is pretext for discrimination. The first two arguments turn on Trinity's application of its internal disciplinary policy. Vandine's third and fourth arguments turn on Trinity's application of its Patient ID Policy. Vandine's fifth and sixth arguments focus on indirect evidence of pretext.

6

One: Vandine's error was not a serious infraction but a "serious near miss," which should not have resulted in a third "occurrence"—Trinity's parlance for strike three—but instead resulted in 1/3 of an occurrence. Vandine considers the violation a "serious near miss" because the error was caught and corrected before any healthcare providers received the preliminary report. (Pl.'s Resp. at 5). With the December 6th error counted as 1/3 of an occurrence, Vandine would not have accumulated enough "points" to justify her termination. Therefore, Trinity's reason is insufficient to explain its actions, showing pretext.

"Serious near misses" are "[p]otential serious errors that are promptly caught, corrected, and documented, and clinicians notified before results have been called or typed and patient care affected." (Def.'s Ex. B). While the error was caught and corrected quickly, Davenport had already entered the results on the computer, and a radiologist read the file and sent back a report with the wrong patient's name on the report. First, were the results "called or typed?" Yes: the Court views entering the x-ray into the computer system and sending it for review by a doctor as "called or typed," however infelicitous and vague that phrase may be.

But Trinity construes its own definition of "serious near miss" as a disjunctive test, arguing that since the error was not caught "before results have been called or typed," it cannot be a near miss. (Def.'s Reply at 7). But the definition is stated in the conjunctive: "serious near misses" occur only when the serious error is "caught . . . before results have been called or typed *and* patient care affected." (PageID 414) (emphasis added). Trinity never argues that any patient care was affected; it only argues that it could have been affected. (Def.'s Reply at 6–8). Trinity observes that if an error could have negatively affected patient care, it falls within the definition of a serious infraction: "errors that . . . (could have if not caught) caused inappropriate care, treatment, or harm of a patient." But a serious error is a serious near miss if it's caught before patient care is affected, and here the only evidence Trinity has is that patient care could have been affected, not that it was affected. The confusion here lies with Trinity's own infelicitous policy document, which creates two not entirely consistent types of infraction.

So while the policy is ambiguous, Trinity's behavior at the time of the error was not. At the time of the error, Trinity treated the infraction as a serious error. (PageID 420). Trinity could view Vandine's error as affecting patient care. The "correct" patient was pregnant, so much so that she was in a "birthing" room. The corrected report with the right patient's name had to be resent to the radiologist. Trinity claims this was a serious error because the delay in results could

have delayed treatment to the patient in labor, and it could have resulted in an unnecessary procedure being performed on the wrong patient. (Vaughan Aff. at ¶¶ 5–6). It could have, and it did delay any proper diagnosis stemming from the x-ray. At bottom, the definition of "serious near miss" appears to conflict with a plain sense reading of Trinity's own definition of a "serious infraction." With Trinity's ambiguous policy, it's possible to construe Vandine's error as either a serious infraction or a serious near miss.

Regardless of this, "'[a]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.'" *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 728 (6th Cir. 2008) (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). "[A]lthough failure to follow internal disciplinary procedures can be evidence that an employee's poor performance was not the real reason for her termination, not every technical failure to follow disciplinary protocol is necessarily evidence of pretext." *Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 846–47 (6th Cir. 2015) (citations omitted). "An employer's failure to follow internal disciplinary protocols is most probative when coupled with evidence that the employer followed the protocols for people outside of plaintiff's protected class." *Id.* at 847 (quoting *Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 595 (6th Cir. 2006)).

Here, Vandine argues that Trinity's failure to follow its own disciplinary protocol shows that its reason for firing her was mere pretext. But Trinity has a good argument that it did follow its policy. Trinity put Vandine on notice that she was in danger of being fired well before she was fired. This evidence of a good-faith firing is set up against Vandine's lack of evidence that Trinity operated its policy differently for people outside of Vandine's class. As Trinity correctly observes, if Vandine received the discipline she wanted for her final infraction—a written warning—her co-worker who was also cited for a serious error would have a claim that Trinity deviated from its policy in treating Vandine leniently. The bottom line is this: however poorly written, the only evidence is that Trinity applied its policy in a straightforward way to all of its employees. In any event, Trinity didn't bind its own hands with its disciplinary policy, because its

8

policy also includes a provision that allows it to consider all of the circumstances of a given violation to determine the proper disciplinary action. (Def.'s Ex. B at PageID 413).

Vandine's first argument does not show pretext because Trinity had an honest belief in its proffered reason and had the flexibility to consider all the circumstances of a given violation rather than slavishly apply its own hard-to-follow disciplinary policy.

Two: Trinity's policy says that Vandine needed to accrue three occurrences within six months to be terminated, but she only received two occurrences in her final six months; therefore, she shouldn't have been fired.

Again, because of Trinity's own infelicitous policy documents, confusion reigns. Here's the confusing language from Trinity's policy: "With each occurrence the employees' previous six months history will be considered. After six months without an occurrence the employee will be out of steps for this disciplinary policy. The six month period will start with the first infraction." (PageID 415). Importantly, upon the third occurrence, the employee is discharged. (PageID 414).

Vandine argues that the policy only dictates discharging an employee when she has three occurrences within a six-month period. Trinity argues that with each occurrence, the six-month clock gets re-set and the discipline is stepped up. These positions are not consistent with each other, but both find support in Trinity's policy.

Supporting Vandine's interpretation is the language that "[t]he six month period will start with the first infraction." (PageID 415). This implies that the period is static – six months that either ends with the employee "cycling-off" of the disciplinary period, or a third occurrence and termination. The first sentence could also support Vandine—if only the previous six months history will be considered, then in this case Trinity could only consider two of Vandine's occurrences, not three.

Trinity cites the first sentence as supporting it too—"with each occurrence the employees' previous six month history will be considered." (PageID 415). This sentence contemplates a number of linked six-month periods. Critically, the second sentence supports Trinity's interpretation that the policy is a stepped process, and an employee needs to have six months without an infraction to "cycle-off" the process and have their slate wiped clean. It appears that the third sentence, the worst for Trinity's interpretation, merely indicates how the clock starts ticking in the first place.

"[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White*, 429 F.3d at 246. That's exactly what Vandine argues. And here, it's not clear that Trinity misapplied its policy. The best evidence on the issue of pretext is how the parties read the disciplinary policy leading up to December 6. The critical piece of information is this: Vandine acknowledged that after her five-day suspension in July 2012, she was aware that she could lose her job if she had another serious infraction in the next six months. (Vandine Dep. 30:10–13). The employee counseling form she signed is more general, but informed her that if her sub-par performance "is not corrected, you will be subject to further disciplinary action which could result in termination." (PageID 429, 430). Because both Trinity and Vandine thought that another serious infraction by Vandine within six months of her May infraction would lead to her termination, no reasonable juror could think that Trinity being true to its word and doing what Vandine expected was pretext for age discrimination.

Three: Vandine was not responsible for the failure to follow the Patient ID Policy. Her co-worker, Ms. Davenport, was the "main" rad tech responsible for the x-ray, the one who received the x-ray request form, the one who entered the image and information into the computer, and the one who finalized and sent off the order to the radiologist. As the "main" rad tech, Davenport, and not Vandine, was responsible for checking the patient's identity before administering the x-ray. Vandine argues that her actions followed a Trinity policy that distinguished between "main" and "assistant" rad techs.

This policy derives from an email sent by a Trinity employee—Melissa Ciciarelli—to various radiology employees—"clerks" and "techs." (Email from Ciciarelli, Doc. 34-4). The email covers various topics; pertinent to this discussion is a section discussing the "[r]esponsibilites for the techs." (*Id.*). It describes a "main tech" and an "assisting tech." (*Id.*). Vandine construes this email to show that the main tech has the responsibility to comply with the Patient ID Policy. But neither the Patient ID Policy, nor the Ciciarelli email show what Vandine claims.

First of all, the Patient ID Policy states, without saying who exactly is responsible for this, that "[a]ll inpatients/outpatients who present for treatment or service will be identified by name and date of birth provided on armband." (Patient ID Policy at § V., PageID 411). The policy fails to single out an individual responsible for identifying patients, but that's the point: the policy makes it the treatment or service providers' responsibility to identify the patient. An x-ray

10

is treatment, and Vandine's objections aside, she helped in the treatment—she placed the x-ray film under the patient and maneuvered the arm of the x-ray machine into position. The Patient ID Policy doesn't precisely place responsibility with one rad tech or the other. It simply states that the patient must be identified. That didn't happen here; therefore, Vandine, as one of the rad techs providing treatment or service, was responsible for this breach of policy.

Furthermore, the Ciciarelli email contains aspirational goals for a division of labor, but makes clear that imaging "is a combined work responsibility for the techs involved therefore (sic) should be as 'even' as possible." (*Id.*). While the "main tech . . . will be the tech that name (sic) goes in PACS and is tech 1 in meditech," nothing in the policy relives the "assisting tech" of responsibility to follow the Patient ID Policy. (*Id.*). Furthermore, this policy is far from ensconced as a superseding policy document at Trinity—it was "a work in progress." (*Id.*). To the extent Trinity made any distinction between main and assisting rad techs, it did not abrogate the Patient ID Policy in doing so.

Finally, Vandine was already involved in a two-rad-tech discipline case. In her July 2012 infraction, Vandine and another rad tech x-rayed the wrong patient and both received discipline in step with Trinity's protocol. (Vandine Dep. 47–48; 37–38). This is clear evidence of good faith on the part of Trinity in applying its Patient ID Policy consistently. The Ciciarelli email sent after this discipline case did nothing to change the Patient ID Policy. Furthermore, this evidence refutes Vandine's argument that the Patient ID Policy didn't require her to "double-check" to see if her co-worker had properly identified a patient.

Vandine argued that Trinity's reason had no basis in fact because Vandine didn't violate the Patient ID Policy. Vandine has failed to carry her burden on this point because there is only evidence that she did violate the policy and no evidence that she was not responsible for following the Patient ID Policy as she helped administer an x-ray.

Four: Davenport and Vandine x-rayed the right patient, but because a clerk entered the wrong name on the x-ray request form, the radiologist returned a report with the wrong patient's name attached to the x-ray diagnosis. As Vandine puts it, the error was "literally clerical." (Pl.'s Resp. at 5).

But this isn't the error for which Vandine was fired. Vandine didn't follow the Patient ID Policy. The only reason Davenport and Vandine x-rayed the correct patient is because they ignored the information on the x-ray request form and instead listened to the floor nurses. The

11

nurses were right about which patient to x-ray, but since neither rad tech checked the patient's identity, Davenport filed the x-ray under the wrong patient file. Vandine wasn't disciplined for the unit clerk's clerical error; she was disciplined for her failure to follow the Patient ID Policy.

Five: Trinity's shifting rationales for its decision and its lack of an investigation before firing Vandine are indirect evidence of pretext. Shifting justifications are enough for a pretext issue to survive summary judgment:

> Shifting justifications over time calls the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination.

*Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

"[S]hifting justifications raise an inference that the proffered reasons are false and are pretext for discrimination." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 541 (6th Cir. 2014). A true shift in justification is, for example, when an employer fires an employee and justifies it by explaining it needed to field another team in another department, but later in answers to interrogatories says it fired the employee for poor performance, and later still at summary judgment says it fired the employee for other reasons. *See Cicero*, 280 F.3d at 591–92.

Here, Vandine argues that changes in two key facts create an inference that Trinity's proffered reason is pretext. First, Vandine argues that in its position statement to the EEOC, Trinity stated it fired Vandine for having three serious errors within 12 months. That's not entirely true. Trinity did observe in its letter to the EEOC that the December 2012 error was Vandine's third error in a 12-month period, but this was not in the context of an in-depth discussion of Trinity's disciplinary policy. Nor did Trinity's justification to the EEOC hinge on this statement. It was an explanation of the facts surrounding her termination. Trinity hasn't shifted the reason for firing Vandine—it said to the EEOC that she was terminated pursuant to the same policy it cites now, for the same incident it cites now. Vandine's argument on this point fails.

Second, Vandine argues that a shift in the individuals asserted to have played a role in termination decisions constitutes evidence of pretext. (Pl.'s Resp. at 18). Vandine argues that by introducing Dr. Vaughan's affidavit, Trinity contradicts its statements about who was involved in the decision to fire Vandine. Dr. Vaughan states that he was approached by Trinity staff on the day of the incident and, after hearing the details of the infraction, advised them that Vandine and Davenport violated the Patient ID Policy, and it was a serious radiology error that could have

12

resulted in inappropriate care, treatment, or harm to a patient. (Vaughan Aff. at ¶ 4–5). But Trinity, in a response to one of Vandine's interrogatories, failed to mention Dr. Vaughan. Here's the whole interrogatory and response for context:

> 8. State with particularity the reason/s for Plaintiff's termination, identifying any and all persons who played any role whatsoever in the decision and the role/s they played.
> **Response:**
>
> Plaintiff was terminated pursuant to Trinity's Radiology Disciplinary Policy for Serious Radiology Errors after accumulating three serious errors on May 9, 2012, July 20, 2012, and December 6, 2012. The final incident involved Plaintiff's failure to verify a patient's identification.
>
> Judy Zavatsky, Trinity's Director of Imaging Services at the time, made the decision to terminate Plaintiff after discussions with Melissa Ciciarelli, Trinity's Supervisor of Radiology Diagnostics and Plaintiff's direct supervisor, and Lewis Musso, Trinity's Vice President of Human Resources.

(Def.'s Interrogatory Response #8, PageID 315).

Vandine has a point; Trinity failed to mention Dr. Vaughan in their response to interrogatory #8. But Dr. Vaughan never said he was consulted about whether Trinity should fire Vandine. He opined on the factual predicate for her termination, but he did not play a role in the decision. Trinity's decision-makers appear to have used his opinion of the facts and Trinity's policy to make the human-resources decision, but Dr. Vaughan appears to not have played a role in the decision itself. Even if Trinity did file an incomplete discovery response, this isn't evidence of shifting justifications, only additional proof that Trinity made a reasoned decision at the time of Vandine's termination. Vandine's argument fails on this point.

Six: Vandine argues that Trinity never documented a reasonable investigation nor interviewed Vandine prior to her termination as part of its investigation. (Pl.'s Resp. at 10, 16). But the facts show that Trinity did investigate the incident because Judy Zavatsky documented the incident in an employee incident form, describing the exact error and how it was discovered. Furthermore, Ciciarelli testified to performing some investigation, and Dr. Vaughan submitted in his affidavit that he was consulted in response to the incident. Vandine argues that Trinity's failure to comprehensively document its investigation and its failure to interview Vandine after the incident show that Trinity's proffered reason was mere pretext. But there is evidence of Trinity's investigation, and it did record events and interview key witnesses at the time; there is no evidence of post hoc rationalizations. Vandine's final argument fails.

13

At this stage in the burden-shifting framework, Vandine, and not Trinity, bears the burden to show that Trinity's proffered reason for terminating her was not its real reason but only pretext for age discrimination. But viewing the evidence in the light most favorable to Vandine, no reasonable juror could conclude that Trinity's proffered reason was merely a pretext for age discrimination. *Jett v. Am. Nat. Red Cross*, 588 F. App'x 396, 397–98 (6th Cir. 2014). Trinity fired Vandine because she had a pattern of serious errors that sometimes did and always could have led to inappropriate treatment of patients. Vandine has failed to meet her burden to show that Trinity's reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 624 (6th Cir. 2006) (citations omitted). Since there exists no genuine dispute of material fact on the issue of pretext, the issue on which Vandine would bear the burden at trail, *see Celotex*, 477 U.S. at 322–23, summary judgment for Trinity is proper.

## IV) Conclusion

Therefore, Trinity's motion for summary judgment is **GRANTED**. (Doc. 35). The clerk is directed to enter judgment for Defendant and close the case.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE:  September 30, 2016